Brian S. King, #4610
Brent J. Newton, #6950
Samuel M. Hall, #16066
**BRIAN S. KING, P.C.**
420 East South Temple, Suite 420
Salt Lake City, UT 84111
Telephone: (801) 532-1739
Facsimile: (801) 532-1936
brian@briansking.com
brent@briansking.com
samuel@briansking.com

Attorneys for Plaintiffs

THE UNITED STATES DISTRICT COURT
DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| DAVID H., and C.H., <br><br> Plaintiffs, <br><br> vs. <br><br> CIGNA HEALTH and LIFE INSURANCE COMPANY, CIGNA BEHAVIORAL HEALTH, and the HOMESIDE FINANCIAL, LLC. BENEFITS PLAN. <br><br> Defendants. | COMPLAINT |

Plaintiffs David H. and C.H., through their undersigned counsel, complain and allege against Defendants Cigna Health and Life Insurance Company, Cigna Behavioral Health (collectively "Cigna"), and the Homeside Financial LLC. Benefits Plan ("the Plan"), as follows:

**PARTIES, JURISDICTION AND VENUE**

1. David and C.H. are natural persons residing in Cook County, Illinois. David is C.H.'s father.

1

2. Cigna Health and Life Insurance Company was the third-party claims administrator, as well as the fiduciary under ERISA, for the Plan during the treatment at issue in this case. Cigna Behavioral Health, a/k/a Evernorth Behavioral Health, is the mental health arm of Cigna Health and Life Insurance Company and processed many of the claims and appeals at issue in this case.

3. The Plan is a self-funded employee welfare benefits plan under 29 U.S.C. §1001 *et. seq.*, the Employee Retirement Income Security Act of 1974 ("ERISA").

4. David was a participant in the Plan and C.H. was a beneficiary of the Plan at all relevant times. David and C.H. continue to be participants and beneficiaries of the Plan.

5. C.H. received medical care and treatment at Aspiro Adventure ("Aspiro") from November 23, 2020, to February 9, 2021, and at Maple Lake Academy ("Maple Lake") from February 11, 2021, to January 6, 2022. These are treatment facilities located in Utah, which provide sub-acute inpatient treatment to adolescents with mental health, behavioral, and/or substance abuse problems.

6. Cigna denied claims for payment of C.H.'s medical expenses in connection with her treatment at Aspiro and Maple Lake.

7. This Court has jurisdiction over this case under 29 U.S.C. §1132(e)(1) and 28 U.S.C. §1331.

8. Venue is appropriate under 29 U.S.C. §1132(e)(2) and 28 U.S.C. §1391(c) based on ERISA's nationwide service of process and venue provisions, because Cigna does business in Utah, and the treatment at issue took place in Utah.

9. In addition, the Plaintiffs have been informed and reasonably believe that litigating the case outside of Utah will likely lead to substantially increased litigation costs they will be

responsible to pay and that would not be incurred if venue of the case remains in Utah. Finally, given the sensitive nature of the medical treatment at issue, it is the Plaintiffs' desire that the case be resolved in the State of Utah where it is more likely their privacy will be preserved.

10. The remedies the Plaintiffs seek under the terms of ERISA and under the Plan are for the benefits due under the terms of the Plan, and pursuant to 29 U.S.C. §1132(a)(1)(B), for appropriate equitable relief under 29 U.S.C. §1132(a)(3) based on the Defendants' violation of the Mental Health Parity and Addiction Equity Act of 2008 ("MHPAEA"), an award of prejudgment interest, and an award of attorney fees and costs pursuant to 29 U.S.C. §1132(g).

## BACKGROUND FACTS

### C.H.'s Developmental History and Medical Background

11. C.H. met most of her developmental milestones on time, but she was slow to walk and began receiving treatment from a speech pathologist after she was found to have delays in her language abilities and was diagnosed with pervasive developmental disorder. C.H. also received additional treatment for children with developmental delays.

12. When C.H. turned five, she was diagnosed with an auditory processing disorder. C.H. struggled in school and was given an individualized education plan. Around the time that she was in the fourth grade, C.H. was throwing frequent tantrums and having meltdowns. C.H. left public school and started attending a private school.

13. C.H, continued to struggle socially and was often disrespectful to others, particularly her younger sister. C.H. was diagnosed with attention-deficit hyperactivity disorder. C.H. voiced thoughts of hating herself and beliefs that everyone hated her as well.

14. C.H. bullied others and was caught stealing items. C.H. was admitted to an intensive outpatient program, but her therapist stated that they had never seen someone attend the program for as long as C.H. had while making such little progress.

15. C.H. started seeing a new doctor and was given numerous tests and brain scans. These showed that C.H. had brain abnormalities with certain areas being over infused with blood and others being under infused. C.H.'s treatment team stated that this likely contributed to her depression, anxiety, and impulse control issues.

16. C.H. was a habitual liar. She underperformed in school and began isolating herself in her room, rarely getting out of bed. C.H. ignored any consequences to her behavior and would often lie or sneak out. C.H. was enrolled in a one-to-one school called Fusion Academy, and while she started doing better academically, her other bad behaviors still continued.

17. C.H. was discovered to be going onto the internet, lying about her age, and chatting with older men on adult websites. David became concerned that C.H. would be exploited sexually, seriously harmed, or become a victim of human trafficking.

**Aspiro**

18. C.H. was admitted to Aspiro on November 23, 2020.

19. In an explanation of benefits statement dated July 8, 2021, Cigna denied payment for C.H.'s treatment at Aspiro under denial code A0: (emphasis in original)

> YOUR PLAN BOOKLET LISTS THE SERVICES AND PROCEDURES COVERED BY YOUR PLAN. THE PLAN WILL ONLY PAY FOR SERVICES LISTED IN THE BOOKLET.

20. On December 28, 2021, David appealed the denial of payment for C.H.'s treatment. He reminded Cigna that he was entitled to certain protections under ERISA during the

review process, including a full, fair, and thorough review conducted by appropriately qualified reviewers which took into account all of the information he provided, gave him the specific reasons for the adverse determination, referenced the specific plan provisions on which the determination was based, and which gave him the information necessary to perfect the claim.

21. He asked that the reviewer be knowledgeable about generally accepted standards and clinical best practices for outdoor behavioral health programs in the State of Utah and also appropriately qualified to address his arguments concerning a violation of MHPAEA.

22. David argued that coverage for the services C.H. received was available under the terms of the Plan. He noted that the Plan offered coverage for treatment in an "Other Health Care Facility" which it defined as:

> The term Other Health Care Facility means a facility other than a Hospital or hospice facility. Examples of Other Health Care Facilities include, but are not limited to , licensed skilled nursing facilities, rehabilitation Hospitals and subacute facilities.

23. He wrote that Aspiro was a licensed outdoor behavioral health facility which was compliant with governing state law and should have been approved for coverage.

24. He stated that although he could find no exclusions for wilderness or outdoor behavioral health programs in the actual terms of his governing plan document, on Cigna's website he was able to find a medical policy for complementary and alternative medicine which excluded these services.

25. David argued that if the denial was indeed based on these criteria, then it shouldn't have been applied in the first place, as the alternative medicine criteria clearly stated that they were superseded by the terms of "a customer's particular benefit plan document" and in

the event of a conflict, "a customer's benefit plan document always supersedes the information in the Coverage Policies."

26. David wrote that there was a clear conflict between the actual language in his insurance policy booklet and these Cigna criteria, meaning Cigna should never have employed these criteria in the first place.

27. He contended that Aspiro was not experimental or investigational and did not meet the definition of these services in his governing plan documents. He wrote that the American Hospital Association and the National Uniform Billing Committee had assigned wilderness programs their own revenue code. He argued that programs like Aspiro would not have this type of code, nor would they be licensed if they in fact were an experimental or investigational service.

28. He wrote that the efficacy of outdoor behavioral health programs had been proven in multiple peer reviewed research articles and included many of these articles with the appeal. He asked who at Cigna had determined that these programs were experimental, what were their qualifications, and if Cigna was aware of the extensive research and documentation showing the efficacy of wilderness programs.

29. He noted that Cigna's criteria dealt with "wilderness camps." He argued that this was a gross mischaracterization of the treatment programs like Aspiro offered, as it equated them with scout camps, boot camps, or summer camps which were not intended to provide any therapeutic value.

30. David included a letter from Dr. Michael Gass from the University of New Hampshire which critiqued the application of Cigna's Complementary and Alternative Medicine criteria for wilderness programs, criticized Cigna's misinterpretation of the findings of

academic studies, and chastised Cigna for the frequent presence of misinterpretations and erroneous statements.

31. David also included opinions from various external review agencies which had examined wilderness treatment programs and found them to no longer be an experimental treatment.

32. David argued that the denial of payment for C.H.'s treatment likely constituted a violation of MHPAEA. He wrote that MHPAEA compelled insurers to ensure that coverage for behavioral health services were offered at parity with coverage for analogous medical or surgical services. He identified skilled nursing, subacute rehabilitation, and inpatient hospice care as some of the medical or surgical analogues to the treatment C.H. received.

33. He argued that Cigna was imposing restrictions based on facility type and provider specialty by systematically denying services billed under the 1006 revenue code for wilderness treatment as ineligible, regardless of the actual language of the insurance contract.

34. He asked for Cigna to perform a parity compliance analysis on the Plan in order to ensure that the Plan was in compliance with MHPAEA and asked to be provided with physical copies of the results of this analysis.

35. In addition David asked to be provided with a copy of all documents under which the Plan was operated, including all governing plan documents, the summary plan description, any insurance policies in place for the benefits he was seeking, any administrative service agreements that existed, any clinical guidelines or medical necessity criteria utilized in the determination (along with their medical or surgical

equivalents, whether or not these were used), together with any reports or opinions regarding the claim from any physician or other professional, along with their names, qualifications, and denial rates (collectively the "Plan Documents").

36. Cigna did not respond to this appeal.

37. After David received no response to his appeal, he sent Cigna a letter dated February 2, 2023, to address Cigna's failure to respond. He wrote that Cigna had an obligation to respond to his appeal within a sixty-day timeframe but had not done so. He wrote that Cigna continued to refuse to process the appeal, despite numerous attempts on his part to reach out and rectify the situation.

38. He wrote that given Cigna's failure or refusal to abide by its obligations, the appeals process was deemed exhausted. He stated that he would provide any additional necessary documentation upon request.

39. Cigna did not respond to David's February 2, 2023, letter.

## Maple Lake

40. C.H. was admitted to Maple Lake on February 11, 2021.

41. In a letter dated March 2, 2021, Cigna denied payment for C.H.'s treatment at Maple Lake from March 1, 2021, forward. The letter gave the following justification for the denial:

> We reviewed information from MAPLE LAKE ACADEMY LLC, your health plan and any policies and guidelines needed to reach this decision. We found the service requested is not medically necessary in your case.
>
> Based upon my review of the available clinical information, and the MCG Behavioral Health Guidelines, medical necessity is not met for continued stay at Residential Behavioral Health Level of Care, Child or Adolescent, ORG: B-902-RES from 03/01/2021 forward, as you no longer require treatment at the Residential Behavioral Health Level of Care, Child or Adolescent as your condition is adequately stabilized and/or improved so that you can be safely and

> effectively treated at a less restrictive level of care. A less restrictive level of care is available for your safe and effective treatment.
>
> You have made progress in treatment. You have been going to groups. You are learning new skills to manage your difficulties. Your family has been involved in a family session. You have been meeting with your therapist. You are taking your medications as prescribed. You are not having thoughts of hurting yourself. You are not hurting other people.

42. On August 24, 2021, David submitted an appeal of the denial of payment for C.H.'s treatment at Maple Lake. He reminded Cigna that it had an obligation to act in his best interest and again asked to be provided with the full, fair, and thorough review to which he was entitled under ERISA.

43. David took issue with Cigna's application of the MCG criteria and contended that the criteria themselves violated generally accepted standards of medical practice. He wrote that the MCG criteria utilized acute level requirements to evaluate sub-acute levels of care, and in fact were called Residential Acute Behavioral Health Level of Care criteria in prior versions.

44. David stated that apart from the name, little of the criteria's content had changed, and the version of the criteria for children were word-for-word identical to the adult criteria. He cited to various court cases to support his argument.

45. He wrote that insurers were responsible for ensuring that treatment was rendered in accordance with generally accepted standards of practice, and that each insured person received the level of care which was most appropriate and effective for treating their conditions.

46. He stated that C.H. suffered from chronic mental health conditions which led her to display maladaptive and dangerous behaviors which required residential treatment to

safely address, especially as her conditions often exacerbated each other and other levels of care had been ineffective.

47. He contended that if Cigna pushed C.H. into a lower level of care before C.H. was ready, this would inevitably result in poor outcomes and would not appropriately address her conditions. He further asserted that Cigna's criteria required individuals to demonstrate successful treatment outcomes within a specific time period, rather than in accordance with their actual needs or treatment team recommendations.

48. David asked that Cigna rely on the definition of medical necessity in his insurance plan booklet rather than the MCG criteria. He wrote that C.H.'s treatment met this definition, was clinically appropriate, was not more costly than alternative settings, and was rendered in the least restrictive setting which could safely and effectively treat her conditions.

49. David voiced his concern that the denial of payment was a violation of MHPAEA. He wrote that MHPAEA compelled insurers to ensure that benefits for behavioral health services were offered at parity with coverage for analogous medical or surgical services.

50. He identified skilled nursing, subacute rehabilitation, and inpatient hospice care as some of the medical or surgical analogues to the residential treatment C.H. received.

51. David identified two potential violations of MHPAEA. First, he pointed out that the Plan required residential treatment to satisfy the requirements found in the MCG criteria while not utilizing any similar criteria for analogous medical or surgical care.

52. The second was Cigna's requirement that C.H. exhibit acute level symptoms in order to receive sub-acute level residential treatment care. He asked Cigna to perform a

MHPAEA compliance analysis on the Plan to ensure that the Plan was being administered in accordance with the statute.

53. David included letters of medical necessity with the appeal. In an undated letter, Andrea Gordon, M.Ed. wrote in part:

> Given her persistent and escalating needs, [C.H.] requires intensive residential care to address her social-emotional needs, to keep her safe, and to ensure she develops the necessary academic, life, and social-emotional skills necessary. I have continued to meet with [C.H.]'s mom. [E.H.], on a regular basis since [C.H.] began residential treatment. [C.H.] has had great difficulty adjusting to treatment but is beginning to show progress. The wrap-around services that a residential placement provides are medically necessary for [C.H.] to make significant and lasting improvements.

54. Steve Best, M.D., wrote in part in a letter dated June 22, 2021:

> I became very concerned that [C.H.]'s behaviors would lead to irreparable harm to herself given her severe lack of impulse control or insight on her own actions. Given the emergence of symptoms with increasing severity and escalation despite continued outpatient treatment, a more intense level of treatment became necessary. The family shared my fear and agreed that Maple Leaf Academy [sic] was the only option given we have exhausted other less restrictive treatment options.
>
> I consider residential level of care to have been a medically necessary treatment course.

55. Karen Mabie, Ed.S, NCSP, CEP, wrote in part in a letter dated July 7, 2021:

> [C.H.]'s treatment team strongly recommended therapeutic placement as a medical necessity for her emotional and behavioral issues as she had not responded to out-patient treatment or treatment at the IOP.
>
> [C.H.] was placed at Aspiro Adventure Therapeutic Wilderness, where she received individual, group and family therapy. All treating professionals were in agreement that [C.H.] continue to receive the individual, group and family therapy at an all girls residential behavioral health facility. Maple Lake Academy in order to continue her treatment while attending a school with support. She transitioned to Maple Lake Academy in February of 2021, and continues her slow progression to health that was not possible at home.

56. David voiced his concern that Cigna would attempt to supersede the opinions of C.H.'s treatment team, who had witnessed the deterioration of her condition on a firsthand basis, and all of whom opined that her residential treatment was necessary and appropriate.

57. David also included copies of C.H.'s medical records with the appeal and again asked for a copy of the Plan Documents.

58. In a letter dated October 26, 2021, Cigna upheld the denial of payment for C.H.'s treatment. The letter stated in pertinent part:

> Based upon my review of the available clinical information received initially and with this appeal and the MCG Behavioral Health Guidelines, medical necessity was not met for continued stay at Residential Behavioral Health Level of Care, Child or Adolescent from 03/01/2021- 02/28/2022 as you no longer required this level of care for safe and effective treatment. Notes submitted for review by your provider indicated some oppositional behaviors but no significant problems with your daily function or your ability to engage in treatment. There is no documentation of serious behavioral issues requiring 24-hour trained staff. You have been able to independently care for your basic daily needs. Daily notes from your stay do not suggest more serious symptoms such as thoughts of harm to yourself or others. Your parents were, and remain, invested in your care and committed to treatment. Finally, no new symptoms or disorders were evident, such as a substance use disorder that might have indicated a need for further treatment in a residential setting. Based on information submitted for this review, safe and effective treatment could have continued at a less restrictive level of care.

59. On February 10, 2022, David asked for the denial of payment to be evaluated by an external review agency. David expressed concern that Cigna had made no reference to any of C.H.'s medical records or any of the other documentation he had provided to support its decision. He asked the reviewer to make specific references to the clinical evidence used to inform their decision.

60. He argued that Cigna had misapplied the MCG criteria and had, for instance, denied payment due to a lack of danger to C.H. herself or others, even though it had approved

the first eighteen days of C.H.'s treatment even though she was similarly not a danger to herself or others during this initial period.

61. He contended that Cigna had failed to cite to any evidence showing any substantial change in C.H.'s condition after it elected to deny payment. David alleged that in fact C.H.'s medical records clearly showed no substantial changes in her condition which would warrant a denial of payment.

62. He argued that C.H. suffered from numerous conditions which caused her serious dysfunction in daily living which had not been able to be treated effectively at the outpatient level, and that she had only begun to make sustainable gains when receiving treatment at the residential level.

63. He contended that C.H.'s treatment was "necessary, appropriate, and not feasible at a lower level of care." He argued that C.H. met all the conditions for coverage outlined in the MCG criteria, but Cigna seemed to have ignored the bulk of these requirements and based its denial almost entirely on a lack of danger to self or others.

64. He argued that Cigna's justifications were conclusory, ignored clinical evidence, and were made in bad faith. He included updated copies of C.H.'s medical records with the appeal. These records showed that she continued to struggle with negative self-image, defiant behaviors, anxiety, depression, and poor executive functioning skills.

65. David argued that C.H.'s treatment at Maple Lake was necessary to provide her with care that was both safe and effective. He again asked to be provided with a copy of the Plan Documents.

66. In a determination dated May 25, 2022, the external review agency upheld the denial. The reviewer gave the following justification for upholding the denial:

> The requested Residential Behavioral Health Level of Care, Child or Adolescent, ORG: B-902-RES from 3/1/2021- 2/28/2022 was not medically necessary in this case. The appeal letters contain many of the progress notes from the residential facility. However, the notes do not document any severe mental health symptoms necessitating 24 hour residential treatment. The patient was permitted to go on outings, such as a snowmobile ride, and the patient: "Denies any self-injury or suicide attempts or behaviors" and "Risk of harm to self or others: none reported or observed".
>
> The patient had mild symptoms of depression, anxiety and ADHD, with occasional bouts of sarcasm, lying, minor disruptive activities, but no out of control behaviors or symptoms that would meet the standard of care for the intensity of residential treatment. There was no psychosis, no aggression and the patient was capable of doing ADLs (activities of daily living). She attended the academic program, and participated in groups and psychotherapy. As a result, her treatment would have been more appropriate for a less restrictive level of care from 3/1/21-2/28/22.

67. The Plaintiffs exhausted their pre-litigation appeal obligations under the terms of the Plan and ERISA.

68. The denial of benefits for C.H.'s treatment was a breach of contract and caused David to incur medical expenses that should have been paid by the Plan in an amount totaling over $240,000.

69. Cigna failed to produce a copy of the Plan Documents including any medical necessity criteria for mental health and substance use disorder treatment and for skilled nursing or rehabilitation facilities despite David's requests.

## FIRST CAUSE OF ACTION

**(Claim for Recovery of Benefits Under 29 U.S.C. §1132(a)(1)(B))**

70. ERISA imposes higher-than-marketplace quality standards on insurers and plan administrators. It sets forth a special standard of care upon plan fiduciaries such as Cigna, acting as agent of the Plan, to discharge its duties in respect to claims processing solely in the interests of the participants and beneficiaries of the Plan. 29 U.S.C. §1104(a)(1).

14

71. Cigna and the Plan failed to provide coverage for C.H.'s treatment in violation of the express terms of the Plan, which promise benefits to employees and their dependents for medically necessary treatment of mental health and substance use disorders.

72. ERISA also underscores the particular importance of accurate claims processing and evaluation by requiring that administrators provide a "full and fair review" of claim denials and to engage in a meaningful dialogue with the Plaintiffs in the pre-litigation appeal process. 29 U.S.C. §1133(2).

73. The denial letters produced by Cigna do little to elucidate whether Cigna conducted a meaningful analysis of the Plaintiffs' appeals or whether it provided them with the "full and fair review" to which they are entitled. Cigna failed to substantively respond to the issues presented in David's appeals and did not meaningfully address the arguments or concerns that the Plaintiffs raised during the appeals process.

74. In fact, for Aspiro, Cigna failed to respond to David's appeal at all.

75. Cigna and the agents of the Plan breached their fiduciary duties to C.H. when they failed to comply with their obligations under 29 U.S.C. §1104 and 29 U.S.C. §1133 to act solely in C.H.'s interest and for the exclusive purpose of providing benefits to ERISA participants and beneficiaries, to produce copies of relevant documents and information to claimants upon request, and to provide a full and fair review of C.H.'s claims.

76. The actions of Cigna and the Plan in failing to provide coverage for C.H.'s medically necessary treatment are a violation of the terms of the Plan and its medical necessity criteria.

77. While the presentation of alternative or potentially inconsistent claims in the manner that Plaintiffs state in their first and second causes of action is specifically anticipated and

allowed under F.R.Civ.P. 8, Plaintiffs contend they are entitled to relief and appropriate remedies under both causes of action.

## SECOND CAUSE OF ACTION

## (Claim for Violation of MHPAEA Under 29 U.S.C. §1132(a)(3))

78. MHPAEA is incorporated into ERISA and is enforceable by ERISA participants and beneficiaries as a requirement of both ERISA and MHPAEA. The obligation to comply with both ERISA and MHPAEA is part of Cigna's fiduciary duties.

79. MHPAEA requires ERISA plans to provide no less generous coverage for treatment of mental health and substance use disorders than they provide for treatment of medical/surgical disorders.

80. MHPAEA prohibits ERISA plans from imposing treatment limitations on mental health or substance use disorder benefits that are more restrictive than the predominant treatment limitations applied to substantially all medical and surgical benefits and makes illegal separate treatment limitations that are applicable only with respect to mental health or substance use disorder benefits. 29 U.S.C.§1185a(a)(3)(A)(ii).

81. Impermissible nonquantitative treatment limitations under MHPAEA include, but are not limited to, medical management standards limiting or excluding benefits based on medical necessity; refusal to pay for higher-cost treatment until it can be shown that a lower-cost treatment is not effective; and restrictions based on geographic location, facility type, provider specialty, or other criteria that limit the scope or duration of benefits for mental health or substance use disorder treatment. 29 C.F.R. §2590.712(c)(4)(ii)(A), (F), and (H).

82. The medical necessity criteria used by Cigna for the intermediate level mental health treatment benefits at issue in this case are more stringent or restrictive than the medical necessity criteria the Plan applies to analogous intermediate levels of medical or surgical benefits.

83. Comparable benefits offered by the Plan for medical/surgical treatment analogous to the benefits the Plan excluded for C.H.'s treatment include sub-acute inpatient treatment settings such as skilled nursing facilities, inpatient hospice care, and rehabilitation facilities.

84. When Cigna and the Plan receive claims for intermediate level treatment of medical and surgical conditions, they provide benefits and pay the claims as outlined in the terms of the Plan based on generally accepted standards of medical practice.

85. Cigna and the Plan evaluated C.H.'s mental health claims using medical necessity criteria that deviate from generally accepted standards of medical practice. This process resulted in a disparity because the Plan denied coverage for mental health benefits when the analogous levels of medical or surgical benefits would have been paid.

86. As an example of disparate application of medical necessity criteria between medical/surgical and mental health treatment, Cigna's reviewers improperly utilized acute medical necessity criteria to evaluate the non-acute treatment that C.H. received. Cigna's improper use of acute inpatient medical necessity criteria is revealed in the statements in Cigna's denial letters such as "You are not having thoughts of hurting yourself. You are not hurting other people."

87. This improper use of acute inpatient criteria was a nonquantitative treatment limitation that cannot permissibly be applied to evaluate the sub-acute level of care that C.H.

received. The Plan does not require individuals receiving treatment at sub-acute inpatient facilities for medical/surgical conditions to satisfy acute medical necessity criteria to receive Plan benefits.

88. Treatment provided in an acute care environment is necessarily distinct from treatment provided in a non-acute environment. Utilizing acute criteria to evaluate a non-acute claim will result in a near universal denial of benefits, regardless of the medical necessity, clinical appropriateness, or nature of the treatment.

89. Moreover, Plaintiffs pointed out that C.H.'s condition did not materially change between the dates Cigna approved versus those it had not. Cigna only became concerned with C.H.'s lack of suicidal or homicidal behaviors after it decided to deny payment.

90. David further noted that Cigna restricted the availability of C.H.'s treatment by forcing it to comply with requirements contained only within proprietary criteria. David argued that not only did Cigna exempt comparable medical or surgical services from these requirements, but it did not appear to have proprietary medical or surgical criteria for analogous medical/surgical care at all. David requested to be provided with these criteria if they existed, but Cigna ignored this request.

91. Cigna denied C.H.'s outdoor behavioral health treatment in large part on the basis that it was experimental or investigational. The National Uniform Billing Committee, the organization responsible for developing and issuing revenue codes for services, has assigned wilderness programs their own separate revenue code.

92. Plaintiffs are aware of no analogous medical or surgical facilities which have been assigned such a revenue code that are categorically excluded by Cigna.

93. Cigna and the Plan did not produce the documents the Plaintiffs requested to evaluate medical necessity and MHPAEA compliance, nor did they address in any substantive capacity the Plaintiffs' allegations that Cigna and the Plan were not in compliance with MHPAEA.

94. In fact, despite David's request that Cigna and the Plan conduct a parity compliance analysis and despite the direction from the Department of Labor that ERISA plan and claim administrators perform parity compliance analyses, Cigna and the Plan have not provided David with any information about whether they have carried out any parity compliance analysis and, to the extent that any such analysis was performed, Cigna and the Plan have not provided David with any information about the results of this analysis.

95. The violations of MHPAEA by Cigna and the Plan are breaches of fiduciary duty and give the Plaintiffs the right to obtain appropriate equitable remedies as provided under 29 U.S.C. §1132(a)(3) including, but not limited to:

    (a) A declaration that the actions of the Defendants violate MHPAEA;

    (b) An injunction ordering the Defendants to cease violating MHPAEA and requiring compliance with the statute;

    (c) An order requiring the reformation of the terms of the Plan and the criteria utilized by the Defendants to interpret and apply the terms of the Plan to ensure compliance with MHPAEA;

    (d) An order requiring disgorgement of funds obtained by or retained by the Defendants as a result of their violations of MHPAEA;

(e) An order requiring an accounting by the Defendants of the funds wrongly withheld by each Defendant from participants and beneficiaries of the Plan as a result of the Defendants' violations of MHPAEA;

(f) An order based on the equitable remedy of surcharge requiring the Defendants to provide payment to the Plaintiffs as make-whole relief for their loss;

(g) An order equitably estopping the Defendants from denying the Plaintiffs' claims in violation of MHPAEA; and

(h) An order providing restitution from the Defendants to the Plaintiffs for their loss arising out of the Defendants' violation of MHPAEA.

96. In addition, Plaintiffs are entitled to an award of prejudgment interest pursuant to U.C.A. §15-1-1, and attorney fees and costs pursuant to 29 U.S.C. §1132(g)

WHEREFORE, the Plaintiffs seek relief as follows:

1. Judgment in the total amount that is owed for C.H.'s medically necessary treatment at Aspiro and Maple Lake under the terms of the Plan, plus pre and post-judgment interest to the date of payment;

2. Appropriate equitable relief under 29 U.S.C. §1132(a)(3) as outlined in Plaintiffs' Second Cause of Action;

3. Attorney fees and costs incurred pursuant to 29 U.S.C. §1132(g); and

4. For such further relief as the Court deems just and proper.

DATED this 22nd day of November, 2023.

By    s/ Brian S. King
        Brian S. King
        Attorney for Plaintiffs

County of Plaintiffs' Residence:
Cook County, Illinois